# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2019AP1206

†Petition for Review filed.

Complete Title of Case:

**DANIEL J. HENNESSY, JR. AND JANE E. HENNESSY,**

**PLAINTIFFS-APPELLANTS, †**

**V.**

**WELLS FARGO BANK, N.A.,**

**DEFENDANT-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | September 15, 2020 |
| Submitted on Briefs: | March 4, 2020 |

| | |
|---|---|
| JUDGES: | Brash, P.J., Blanchard and Donald, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS: On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Brian G. Cahill*, *Daniel A. Manna*, and *Daniel J. Kennedy* of *Gass Weber Mullins LLC*, Milwaukee.

Respondent
ATTORNEYS: On behalf of the defendant-respondent, the cause was submitted on the brief of *Carla O. Andres*, *Nina G. Beck*, *Daniel J. Blinka* of *Godfrey & Kahn, S.C.*, Milwaukee.

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 15, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1206**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CV8617

**IN COURT OF APPEALS**

DANIEL J. HENNESSY, JR. AND JANE E. HENNESSY,

 PLAINTIFFS-APPELLANTS,

 V.

WELLS FARGO BANK, N.A.,

 DEFENDANT-RESPONDENT.

 APPEAL from an order of the circuit court for Milwaukee County: WILLIAM S. POCAN, Judge. *Affirmed.*

 Before Brash, P.J., Blanchard and Donald, JJ.

¶1 BLANCHARD, J. Daniel Hennessy and Jane Hennessy appeal a circuit court order finding that a Mexican court judgment against the Hennessys is valid under Mexican law, and determining that Wells Fargo Bank, N.A., is entitled to domesticate the Mexican judgment in Milwaukee County Circuit Court, giving

it effect in Wisconsin under principles of comity.  On the valid-under-Mexican-law issue, the Hennessys argue that the circuit court clearly erred in finding key facts.  We disagree and conclude that there is evidence in the record that would permit a reasonable person to make the same findings.  On the comity issue, the Hennessys contend that the circuit court erroneously exercised its discretion in multiple ways.  We reject this argument because we conclude that the court properly considered the facts of record under the proper legal standards and reasoned its way to a rational conclusion.  Accordingly, we affirm.

## BACKGROUND

¶2     The Hennessys planned to build a new condominium building on property in the city of San José del Cabo in the Mexican state of Baja California Sur.  To finance the project, the Hennessys borrowed $7.5 million from M&I Bank in June 2008.  The obligations of the parties to the financing of the condo project were defined in a set of interrelated construction loan documents:  a loan agreement, a note, and a trust agreement.[1]  We provide additional details as

---

[1]  The following are the construction loan documents:

- **Construction Loan Agreement ("the loan agreement")**.  The loan agreement is an English language document that states that it is to be governed by Wisconsin law.  It is partly premised on the existence of a contemporaneous promissory note and addendum to the note (referred to below) between lender M&I and the borrowers, the Hennessys.  The loan agreement further states that proceeds of the $7.5 million loan are to be used for construction on land "owned, or to be owned" by a trust (referred to below in connection with the Guaranty Trust Agreement).

- **Note And Addendum ("the note")**.  The note consists of a June 27, 2008 note and June 30, 2008 addendum to the note, both in English, reflecting the Hennessys' promise to pay the

(continued)

2

necessary in the Discussion section below, but the following serves as basic background, none of which is disputed.

¶3      Mexican law limits ownership of certain types of real property by non-Mexican citizens such as the Hennessys.  For this reason, the construction loan documents reflected that the Mexican property was to be held in trust with a Mexican entity as trustee, not by the Hennessys.  M&I agreed to make the loan based on the "lien[s] or security interest[s]" in the property granted under the trust agreement, with the Hennessys obligated to make timely payments to note holder M&I under the loan agreement and note.  If the Hennessys defaulted, and M&I made a request, the Mexican trustee was to "sell the Trust Property and use the income received from the sale to pay" M&I.

¶4      Wells Fargo succeeded in interest to all rights of M&I under the construction loan agreements.

¶5      After the loan proceeds were disbursed, the Hennessys failed to make required payments on the loan under the note.  In August 2010, Wells Fargo instructed the Mexican trustee to take steps to sell the property, outside formal court proceedings, as contemplated in the event of default under the construction

loan with interest.  Like the loan agreement, the note states that it is to be governed by Wisconsin law.

- **Guaranty Trust Agreement ("the trust agreement")**.  The trust agreement is a Spanish language document, portions of which are translated into English in one exhibit in the record.  Unlike the loan agreement and the note, the trust agreement was to be governed by Mexican law, and venue for legal proceedings related to it "shall be in the appropriate federal or state courts located in Mexico, and such courts shall have exclusive jurisdiction over all disputes and all matters related thereto."

3

loan agreements. However, this attempt at extrajudicial action was stalled by a legal action that the Hennessys initiated in a Mexican court seeking to nullify the assignment from M&I to Wells Fargo, although the Hennessys' nullification action was ultimately unsuccessful.

¶6    In May 2012, Wells Fargo initiated a form of foreclosure action in the Eighth District Civil Court, a Mexican federal court in Mexico City.[2] Wells Fargo sought in this action the return of the $7.5 million principal plus interest, damages, and fees pursuant to the construction loan documents, and its submission included copies of the construction loan agreements.

¶7    In March 2014, the court issued the Mexican judgment that is at issue in this case. The court stated in pertinent part, as translated into English:

> The Hennessys are sentenced to pay Wells Fargo the principal amount of US $ 7,500,000.00 (seven million, five hundred thousand and 00/100 United States dollars, legal tender in the United States of America), in its equivalent in national currency (pesos) at the time that payment is made. In addition, the Hennessys are sentenced to pay ordinary interest, as was agreed to in the construction loan agreement, documented in the promissory note signed on the twenty-seventh of June of two thousand and eight, which may be quantified in an enforcement ruling. The Hennessys are notified that if they do not pay the foregoing amounts, they will be ordered to deliver to Wells Fargo the property with which the Hennessys guaranteed the promissory note in the loan agreement, so that the property can be auctioned off according to the terms of the chapter that applies to this matter.

---

[2] Naturally, all original pleadings and court decisions in the Mexican action are in Spanish. But the record contains either full or partial translations into English of various documents. Neither side raises any language translation accuracy issues; instead, they dispute the legal significance of various statements and actions of Mexican courts.

4

(Names of parties here substituted for party designations before the Eighth District Civil Court.) Both parties appealed this decision to Mexico's Third Unitary Court. In an October 2014 decision, the appellate court modified the judgment, but affirmed it as modified. The modifications made by the appellate court are not significant to the arguments between the parties here. Neither side successfully appealed the judgment of the appellate court, as modified, and we follow the circuit court here in referring to this as "the Mexican judgment."[3]

¶8    The Hennessys filed this action in Milwaukee County Circuit Court in November 2016. They sought a declaration "that Wells Fargo is barred from asserting any action or claim against the Hennessys to enforce any obligation under" the construction loan documents. This request was based on Wisconsin's six-year statute of limitations for breach of contract claims. *See* WIS. STAT. § 893.43(1) (2017-18).[4]  The Hennessys argued that Wells Fargo's attempt at an extrajudicial sale of the property in August 2010 triggered the running of the limitations period, which had lapsed three months earlier, in August 2016. The circuit court agreed with the Hennessys. On summary judgment, the court declared that Wells Fargo could not initiate after August 26, 2016, a breach of contract claim based on the construction loan documents.

¶9    Separately, Wells Fargo counterclaimed for domestication of the Mexican judgment. This was a request for an order from the circuit court declaring, as a matter of comity, that the Mexican judgment against the Hennessys

---

[3] For context, we note that it is undisputed that Wells Fargo eventually took possession of the Mexican property from the Hennessys during the summer of 2017.

[4] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

is a valid, final money judgment enforceable against the Hennessys that should be entered on the Milwaukee County judgment and lien docket. In its summary judgment ruling, the circuit court explained that its ruling on the statute of limitations issue had no effect on Wells Fargo's counterclaim, because the Mexican judgment arose from a proceeding initiated before August 26, 2016 (indeed, the judgment was itself issued before that date).[5]

¶10 To resolve the counterclaim, the circuit court began by conducting an extended evidentiary hearing over the course of two days. At this hearing, both sides were allowed to present evidence and present arguments addressing the circumstances surrounding the creation of the Mexican judgment and the judgment's meaning under Mexican law. The court was presented with citations to Mexican legal authorities, documents from the Mexican proceedings, and expert testimony.

¶11 After weighing this evidence and the arguments of the parties, the circuit court found that the Mexican judgment is valid under Mexican law. The court then considered arguments from the parties as to whether comity requires that the Mexican judgment be recognized as a valid judgment in Wisconsin. The court agreed with Wells Fargo, ruling that the Mexican judgment "is a final [j]udgment entitled to recognition by this [c]ourt."

¶12 Accordingly, the circuit court entered an order directing the county judgment clerk to enter and docket the Mexican judgment against the Hennessys

---

[5] The Honorable John J. DiMotto entered summary judgment based on the statute of limitations. Following Judge DiMotto's retirement, the Honorable William S. Pocan resolved the counterclaim.

in the principal amount of $7.5 million, plus unpaid ordinary accrued interest. As part of this order, the court declared that the Mexican judgment "allows Wells Fargo to foreclose on the underlying collateral property and to seek any resulting deficiency from the Hennessys" between what Well Fargo can realize from the sale of the property and outstanding loan debt, and that the judgment clerk "need not calculate the amounts due and owing, if any." The Hennessys appeal.

## DISCUSSION

¶13    We address in turn the Hennessys' arguments that the circuit court clearly erred in finding that the Mexican judgment is valid under Mexican law and that it erroneously exercised its discretion in recognizing the Mexican judgment for domestication in Wisconsin.

### I.    VALIDITY UNDER MEXICAN LAW

¶14    The Hennessys do not challenge the form of the Mexican judgment in itself, nor the authority of the Mexican court to issue it. Instead, their validity challenge is that the circuit court clearly erred in accepting one expert view that the Mexican judgment gives Wells Fargo authority to pursue a deficiency against the Hennessys under Mexican law. Specifically, they argue that the circuit court clearly erred in finding the following as facts: (1) that the Mexican judgment functions, at least in part, as an *in personam* money judgment against the Hennessys (when the circuit court should have found instead that the Mexican judgment is solely the product of an *in rem* proceeding, with foreclosure as the only remedy that it provides); and (2) that the Mexican judgment resolved the personal liability of the Hennessys on the loan agreement and the note.

### A.       Standard Of Review

¶15    Our standard of review on this issue is unusual, in that it requires us to treat as issues of *fact* the resolution of what a foreign country's *laws* mean. When Wisconsin circuit courts are called on to examine the substance of the laws of a foreign country, they are finding facts, which "'must be proved [in the same way] as any other fact in a case.'" *See Griffin v. Mark Travel Corp.*, 2006 WI App 213, ¶4, 296 Wis. 2d 642, 724 N.W.2d 900 (quoting *Hite v. Keene*, 149 Wis. 207, 217, 134 N.W. 383 (1912)).  In this context, the fact-finding circuit court may not rely on judicial notice of a foreign country's law, WIS. STAT. § 902.02(5), but instead resolves an issue "of pure fact." *Id.*, ¶4.

¶16    Under this "pure fact" approach, a circuit court's findings regarding the laws of another country "may not be set aside on appeal unless they are 'clearly erroneous.'" *Id.* (citation omitted).  Under the clearly erroneous standard, we affirm the circuit court's findings so long as there is evidence in the record that would permit a reasonable person to make the same findings, even if contrary findings could also reasonably be made based on the same evidence. *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530.  We will search the record for evidence supporting the court's findings, not for evidence opposing them. *Id.*  If there is conflicting testimony on an issue, the circuit court is the ultimate arbiter of witness credibility. *See Adams Outdoor Advert., Ltd. v. City of Madison*, 2006 WI 104, ¶27, 294 Wis. 2d 441, 717 N.W.2d 803.

¶17    The Hennessys formally acknowledge the correct standard of review.  However, they then cite to Texas case law, which appears to diverge from Wisconsin on the standard of review.  More significantly, the Hennessys reveal a

significant misunderstanding in citing as persuasive authority an opinion of a federal appellate court that applies a standard of review that is starkly different from Wisconsin's. *See **Bodum USA, Inc. v. La Cafetiere, Inc.***, 621 F.3d 624 (7th Cir. 2010) (applying FED. R. CIV. P. 44.1). The federal rule provides in pertinent part: "In determining foreign law, the court *may* consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1 (emphasis added). As explained in ***Bodum***, under FED. R. CIV. P. 44.1, the use of expert testimony to assist in the interpretation and application of foreign law is permitted to assist the court with its objective review of the meaning, but unlike in Wisconsin, evidence of this type is not required. *See **Bodum***, 621 F.3d at 628.[6]

¶18    As noted, Wisconsin's standard of review is unusual territory for Wisconsin appellate courts. Under our standard, in contrast to the federal standard, we defer even to the circuit court's interpretation of the meaning of the

---

[6] In ***Bodum USA, Inc. v. La Cafetiere, Inc.***, 621 F.3d 624 (7th Cir. 2010), the Seventh Circuit independently interpreted the meaning of a stock purchase agreement governed by French law. In doing so, the court explicitly rejected the argument, which was based on expert testimony, that a "French preference for intent over text means that interpretation must be a question of fact," because ascertaining the intent of the foreign law "is done by objective means." *Id.* at 631; *see also id.* at 628 ("Although Fed. R. Civ. P. 44.1 provides that courts may consider expert testimony when deciding questions of foreign law, it does not compel them to do so—for the Rule says that judges 'may' rather than 'must' receive expert testimony and adds that courts may consider 'any relevant material or source.' Judges should use the best of the available sources."). One concurring judge explained the view that it is an "unsound judicial practice" for courts to rely on expert testimony to "establish the meaning of a law of a foreign country." *Id.* at 631-38. (Posner, J., concurring). Another concurring judge made observations that included the following: "I am unpersuaded by my colleagues' assertion that expert testimony is categorically inferior to published, English-language materials" translated from a foreign language. *Id.* at 638-40. (Wood, J., concurring). Putting aside the merits of the view that the practice is "unsound," Wisconsin courts are to treat the issue of the contents of the law of a foreign country as one of "pure fact that must be proved." ***Griffin v. Mark Travel Corp.***, 2006 WI App 213, ¶4, 296 Wis. 2d 642, 724 N.W.2d 900.

English language translations of the Mexican judgment, provided that it is not clearly erroneous and is supported by any evidence, since these are interpretations of Mexican law. Ordinarily, we see ourselves as having the same vantage point as the circuit court when it comes to interpreting texts of all kinds, including judicial opinions, but not here.[7]

## B.  *In Personam* Versus *In Rem*

¶19  The Hennessys' first subargument on the validity issue is that the circuit court clearly erred in finding that, under Mexican law, the Mexican judgment functions as an *in personam* money judgment against the Hennessys. According to the Hennessys, the court should have found that the Mexican judgment was the product of "an *in rem* proceeding in which foreclosure was the sole available remedy." The result of this erroneous finding, the Hennessys contend, is that the court misinterpreted the Mexican judgment to entitle Wells Fargo to a money judgment against the Hennessys for the value of unpaid loan proceeds and interest, including any deficiency after sale of the Mexican property, when all the Mexican judgment entitled Wells Fargo to do was to take possession of the property pledged as collateral for the loan. We reject this argument because the Hennessys fail to direct us to clear error by the court on this topic.

---

[7] For this reason it is perhaps understandable that at times both sides here struggle with this standard. For example, Wells Fargo makes one argument that relies in part on a definition found in Black's Law Dictionary, without citing to any finding by the circuit court or undisputed evidence that Black's, as familiar as it is to us as a source of persuasive authority in some circumstances, is a recognized source of authority for pertinent Mexican law. The Hennessys come back in their reply brief with their own Black's citation, again without attempting to make a connection to Mexican law. All such arguments run afoul of our standard of review.

¶20    In its written decision, the circuit court addressed the evidence regarding the Mexican Commerce Code provision governing the action that Wells Fargo pursued (Article 1414) and case law from Mexican courts addressing forfeiture actions under Article 1414.  Article 1414 governs, among other things, judicial foreclosure proceedings in Mexico.

¶21    A major focus for the circuit court was to determine the meaning of a particular statement in the Mexican judgment, in the context of an Article 1414 proceeding of this type.  The statement in the judgment is the following:  if the Hennessys did not repay Wells Fargo however much of the $7.5 million debt was outstanding, the Hennessys "shall be ordered to surrender to [Wells Fargo] the property with which the promissory note for the loan agreement was guaranteed, so that the property may be auctioned under the terms of the chapter applicable to this matter."  The circuit court identified its primary task as deciding whether, under Mexican law, this statement in the Mexican judgment "allows Wells Fargo to collect a deficiency from the Hennessys."  In other words, the question taken up by the circuit court, as a matter of Mexican law interpretation, is:  does this statement entitle Wells Fargo "to foreclose on the property and seek any deficiency from the Hennessys," or instead does it entitle Wells Fargo to do nothing more than "to foreclose on the property"?

¶22    With all that as background, the circuit court made the following factual findings in this specific context, based on the evidence credited by the court regarding Mexican law:  (1) a creditor relying on an Article 1414 proceeding of this type may recover a deficiency, meaning "the difference in value when the value of a foreclosed property is less than the amount owed"; (2) the creditor does not need to file an entirely new action to recover the deficiency; and (3) the creditor may seek "an *in rem* and *in personam* judgment against a debtor in the

11

same proceeding," such as the proceeding that occurred here. Applying these findings, the court concluded that Wells Fargo had initiated a successful "proceeding[] in which a creditor may obtain both foreclosure on a secured property as well as a personal judgment against a debtor."

¶23 A core argument now advanced by the Hennessys cannot be reconciled with the circuit court's findings. The core argument is that the Mexican judgment "could not be executed upon" as a money judgment in Mexico. But the circuit court found that under Mexican law, the Mexican judgment serves in part as a judgment upon which Wells Fargo is entitled to obtain a deficiency, if there is a deficiency once the Mexican property is sold.

¶24 Under the logic of the circuit court's findings, domestication of the Mexican judgment in Wisconsin permits Wells Fargo to commence a U.S. collection action based on the domesticated Mexican judgment that is binding on the Hennessys. The circuit court credited evidence that Mexican law authorizes such a collection action, which can occur even as enforcement of a Mexican judgment also proceeds in Mexico, with the U.S. collection action being "an action that simply seeks to enforce the [Mexican] judgment."

¶25 In making these findings, the circuit court explicitly rejected various points made by an expert witness called by the Hennessys, Georgina Fabian, and credited testimony from an expert witness called by Wells Fargo, Alejandro Osuna González. Fabian testified in pertinent part that the Mexican judgment is strictly the result of an *in rem* proceeding against the Mexican property (and not against the Hennessys) and that if Wells Fargo sought a deficiency it would have to initiate a new action. More generally, Fabian testified that under Mexican law there is a strict two-step procedure and creditors are prohibited from pursuing both

12

a foreclosure judgment on secured property and a deficiency judgment at the same time. In contrast, Osuna testified in pertinent part that one explicit statement in the Mexican judgment describing the effect of the judgment—when interpreted (as Osuna testified that it should be) "in conjunction with Article 1414"—permits Wells Fargo to seek both foreclosure and any deficiency.

¶26 The Hennessys do not argue that the circuit court misunderstood or misinterpreted Osuna's testimony. Nor do the Hennessys challenge either Osuna's qualifications as an expert or the admissibility of evidence he relied on in his testimony.[8] Instead, their argument boils down to the contention that the circuit court should have accorded no weight whatsoever to the pertinent opinions of Osuna and should have fully credited the pertinent opinions of Fabian, based on various sources of authority. They argue that "the clear preponderance of the legal authorities and other evidence presented" established that Osuna's testimony, which was credited by the circuit court, was wrong as a matter of Mexican law.

¶27 For support, in addition to Fabian's testimony, the Hennessys primarily direct us to statements in English translations of two opinions of the "Supreme Court of Justice," apparently suggesting that we should independently draw our own conclusions about the meaning of these opinions in the context of Mexican law governing foreclosure actions. The Hennessys also speak in sweeping terms in their reply brief about how they have "[m]arshall[ed]" the evidence, including expert testimony, in a persuasive case. However, this approach neglects the rule that a fact finder, here the circuit court, can reject any

---

[8] For context, we note that it is uncontested that Osuna is bilingual in Spanish and English, has law degrees from both Mexican and U.S. institutions, and has practiced commercial law in Mexico, including handling foreclosures.

or all opinions of any expert and misapprehends our standard of review. *See* ***State v. Kienitz***, 221 Wis. 2d 275, 303-04, 585 N.W.2d 609 (Ct. App. 1998) (fact-finding circuit court is generally free to accept or reject portions of an expert's testimony).

¶28 In their principal brief, the Hennessys flatly assert that Osuna "offered no Mexican legal authority to support his" interpretations of Mexican law. However, after Wells Fargo explains in its brief how Osuna supported its position based on an expert opinion that explicitly relied on several provisions of Mexican law, the Hennessys are forced in their reply brief to retreat from their inaccurate initial position.[9] In the end, the Hennessys attempt to argue why they believe that Osuna's testimony was "flawed," but they fail to provide a persuasive example of clear error by the circuit court.

¶29 The Hennessys contend in their reply brief that Wells Fargo misinterprets the English translations of Mexican court opinions. If we were using the objective standard reflected in ***Bodum***, we might decide which side is correct, based on our independent consideration of translations of Mexican court opinions and related Mexican sources of authority. This would be the same way that we might, in other legal contexts, construe a Minnesota Supreme Court opinion, a series of Minnesota reported cases, or a Minnesota statute. *See* WIS. STAT. § 902.02 (1)-(4) (addressing "foreign" U.S. authority); *cf.*, § 902.02(5) (addressing the laws of "[f]oreign countr[ies]"). But as we have explained, when it comes to the construction of a foreign country's law under the proper standard of review we

---

[9] This included Osuna's testimony about Article 1391 of the Mexican Commerce Code, which he testified allows a creditor to use a summary procedure to enforce a final judgment against a debtor without filing a new action.

do not engage in that sort of familiar de novo construction. The Hennessys fail to show that it would have been clear error for the circuit court here to interpret the Mexican court opinions as Wells Fargo interprets them, based on the testimony of its expert Osuna, who addressed Mexican court precedent in testimony that the circuit court could have reasonably credited.

¶30     The Hennessys also argue in their reply brief that Osuna's opinions "distort[]" Article 1414 and that Osuna failed to properly take into account the fact that the loan agreement and note are to be interpreted under Wisconsin law, which was "applicable" law under the terms of Article 1414. This is related to one of the Hennessys' core contentions, which is that the only way for Wells Fargo to obtain an *in personam* judgment against them is under the Wisconsin-law-based agreements. The Hennessys fail on all related arguments because they do not persuade us that it was clear error for the circuit court to credit Osuna's interpretation of Article 1414 in the context of the facts here, including (as discussed further in the next subsection) the circuit court's explicit finding that the Mexican judgment "determined all the loan documents had been breached." We are to search for reasons to sustain the circuit court's findings of fact, not for reasons to upset those findings.

### C.     Personal Liability

¶31     The Hennessys' second subargument on the validity issue is that the circuit court clearly erred in finding that, under Mexican law, the Mexican judgment was based in part on the two Wisconsin-law-based construction loan documents (the loan agreement and the note), and not, as the Hennessys submit had to be the case, based exclusively on the Mexican-law-based trust agreement. The result of this erroneous finding, according to the Hennessys, is that the court

misinterpreted the Mexican judgment to have adjudicated the Wisconsin-law-based contracts. However, as with their *in personam* argument, at most the Hennessys point to grounds for potential legitimate differences of opinion about what the Mexican court may have intended to establish in the Mexican judgment, but not to clear error by the circuit court.

¶32 The Hennessys submit that it would be a "remarkable proposition" if the fact that Wells Fargo incorporated all of the construction loan documents into its Mexican complaint by referencing them and attaching them as exhibits (including translating them into Spanish) could support the circuit court's finding that the Mexican judgment adjudicated the Hennessy's liability under the Wisconsin-law-based agreements. They also stress that other Mexican courts that have rendered rulings addressing aspects of the litigation have declined to analyze the Wisconsin-law-based agreements, at times suggesting that Wells Fargo's foreclosure claim was brought solely under the trust agreement. Again, however, these are merely reasons that the circuit court might have found different facts, such as that the Mexican court, in rendering the Mexican judgment, did not purport to construe the Wisconsin-law-based documents and therefore did not purport to address *in personam* relief. But these are not reasons to conclude that the circuit court committed clear error in finding the contrary facts that it did find when viewing the evidence as a whole.

¶33 As Wells Fargo points out, the circuit court was presented with evidence that would permit a reasonable person to make the same findings as the court. It does not matter that other reasonable findings could have been made. The Mexican judgment expressly refers to the "loan documents" (not only to the trust agreement) as being "admitted into court as evidence," and it also awards Wells Fargo fees, costs of collection, and other remedies to which Wells Fargo

16

was entitled only under the terms of the Wisconsin-law-based agreements. Beyond all that, as Wells Fargo also points out, the construction loan documents were explicitly interrelated and cross-referenced, so that any court seeking to address one document in strict isolation would be expected to make that clear, which the Mexican judgment apparently does not do.[10]

## II. COMITY

¶34 The Hennessys argue that the circuit court erroneously exercised its discretion by failing to recognize that the Mexican judgment: (1) is not a final money judgment that could be enforced in Mexico; (2) does not grant Wells Fargo recovery of a specified sum of money; and (3) cannot be domesticated without usurping and disrespecting the Mexican judicial process. We now address each of the three arguments that the Hennessys make in challenging the circuit court's discretionary comity decision.

¶35 The circuit court did not make extensive comments in reaching its comity decision. It essentially determined that Wells Fargo is entitled to domesticate the Mexican judgment because it is a valid, final, non-appealable judgment that should be recognized in the U.S., consistent with persuasive authority that includes the Restatement (Third) of Foreign Relations Law ("the Restatement"). The circuit court implicitly relied on its prior findings of fact about the meaning of the Mexican judgment under Mexican law in reaching its comity decision.

---

[10] As Wells Fargo points out, the expert for the Hennessys, Fabian, acknowledged on cross-examination that the trust agreement could not exist in the absence of the other construction loan documents, and that breach of the Wisconsin-law-based documents constituted breach of the trust agreement.

17

## A.    Standard Of Review And Substantive Legal Standard

¶36    The parties agree that the following summary of the law applies to our review of the circuit court's decision to give effect to the Mexican judgment:

> Under [the comity] doctrine, [circuit] courts will, as a matter of discretion, rather than obligation, defer to the assertion of jurisdiction or give effect to the judgments of other states or sovereigns out of mutual respect and for the purpose of furthering the orderly administration of justice. The scope of comity is determinable as a matter of judicial policy, and we review the circuit court's decision under the erroneous exercise of discretion standard. A court properly exercises discretion when it considers the facts of record under the proper legal standard and reasons its way to a rational conclusion.

*Mills v. Vilas Cty. Bd. of Adjustments*, 2003 WI App 66, ¶19, 261 Wis. 2d 598, 660 N.W.2d 705 (citations omitted); *see also* *Grant Cty. Dep't of Soc. Servs. v. Unified Bd. of Grant and Iowa Ctys.*, 2005 WI 106, ¶25, 283 Wis. 2d 258, 700 N.W.2d 863 ("Comity is based on respect for the proceedings of another system of government.").[11]

¶37    We observe that, under these standards, circuit courts are allowed to exercise extremely broad discretion in determining whether two factors—"mutual respect" for foreign legal systems and "the purpose of furthering the orderly administration of justice"—call for recognition of a foreign judgment.[12]    In

---

[11] We need not resolve the dispute between the parties over whether there is a strong presumption that all final judgments of Mexican courts should be domesticated in the U.S., as Wells Fargo suggests, based on what it submits is persuasive authority. We would affirm even if we were to assume no such strong presumption.

[12] The Hennessys cite Wisconsin authority for the proposition that circuit courts are not under any "compulsion" to "recognize or enforce judgments from foreign countries." *See Estate of Steffke v. DOR*, 65 Wis. 2d 199, 202-03, 222 N.W.2d 628 (1974) (citing LEFLAR, AMERICAN CONFLICTS LAW, § 74, at 172). However, a review of *Estate of Steffke* reveals that in making this statement the court was contrasting the "compulsion" of Wisconsin courts to recognize a

(continued)

addition, both parties make comity arguments based on the premise that Wisconsin courts should follow the Restatement, in particular §§ 481 ("Recognition and Enforcement of Foreign Judgments") and 482 ("Grounds for Nonrecognition of Foreign Judgments").[13] We will assume without deciding, in favor of the Hennessys, that the circuit court was obligated to apply these two sections of the Restatement in making its discretionary comity decision.

### B. Not A Final Money Judgment

¶38 The Hennessys argue that the circuit court erroneously exercised its discretion in recognizing the Mexican judgment under the comity doctrine because Wells Fargo did not "allow the Mexican courts to finish their work." The Hennessys point to the fact that Wells Fargo has not yet pursued a public auction of the Mexican property, followed by (in the event of a deficiency) the filing of a "new action in Mexico" seeking a deficiency judgment, and finally obtaining a

---

judgment of a different U.S. state, as a matter of "full faith and credit," with the quite distinct comity doctrine. *See id.* This distinction is completely consistent with the broadly discretionary comity standard regarding foreign country judgments that we quote in the text.

The court in *Estate of Steffke* proceeded to quote a passage from an earlier Wisconsin opinion, which expresses the idea that comity is "'a rule of practice'" and "'not a rule of law,'" under which a foreign judgment should generally be recognized, "'having due regard to duty and convenience and to rights of [Wisconsin's] own citizens,'" but not if that would violate a Wisconsin statute, which is not a circumstance presented in the instant case. *See id.* at 203 (quoting *Hughes v. Fetter*, 257 Wis. 35, 39, 42 N.W.2d 452 (1950), *rev'd*, 341 U.S. 609 (1951), on grounds not pertinent to the instant case). Again, we construe the passage in *Hughes* quoted in *Estate of Steffke* to be consistent with the standard that we quote in the text.

[13] While the parties do not cite any Wisconsin court reliance on the Restatement (Third) of Foreign Relations Law in this or any context, we have identified two references, albeit none on point here. *See State v. Navarro*, 2003 WI App 50, ¶10, 260 Wis. 2d 861, 659 N.W.2d 487 (citing a Restatement comment regarding the effects of international treaties), and *Lehndorff Geneva, Inc. v. Warren*, 74 Wis. 2d 369, 389, 246 N.W.2d 815 (1976) (citing U.S. federal court reliance on Restatement (Second) of Foreign Relations Law regarding a standard requiring governments to pay just compensation for takings of the property of aliens).

"final executable, *in personam* judgment for a specific sum of money and exhaustion of appellate remedies in the Mexican courts."[14]  For support on this finality subargument on the comity topic, the Hennessys point to authority that they ask us to consider persuasive.  We reject this argument because the Hennessys fail to cite any authority dictating a comity decision different from the one that the court reached in the exercise of its discretion.

¶39     The Hennessys point out that, under § 481(1) of the Restatement, which addresses the recognition and enforcement of foreign judgments, the judgment of a foreign state is not entitled to recognition in a Wisconsin court unless the judgment is "final."  They contend that the Mexican judgment is not final.  More specifically, the Hennessys direct us to a comment to § 481(1), which in pertinent part gives the following definition of "a final judgment":

> A final judgment is one that is not subject to additional proceedings in the rendering court other than execution. That a judgment is subject to appeal or to modification in light of changed circumstances does not deprive it of its character as a final judgment.

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 481(1), cmt. e. (1987). The Hennessys rely on selective quotation of Comment e., however, by noting only the first sentence we quote and leaving out the second sentence.  When one considers the second sentence, as Wells Fargo points out, the meaning changes considerably.  The potential "changed circumstances" here, so far as the circuit court's factual findings regarding Mexican law tell us, could consist of sale of the

---

[14] As part of this argument, the Hennessys renew their objection that the Mexican judgment is "not even a money judgment."  But we have already addressed that issue above, in explaining that the circuit court had an evidentiary basis to conclude that it is in part an *in personam* judgment establishing the personal liability of the Hennessys under the loan documents.

Mexican property, calculation of a deficiency, and an accurate tallying of costs and fees under the construction loan agreements, which would amount to mere "execution" under the Comment e. formulation. The circuit court accepted Wells Fargo's argument, based on Osuna's testimony, that these steps are part of an execution process.

¶40    It is important to recognize that we review the circuit court's comity decision based on the circuit court's findings about Mexican law, including the degree to which the Mexican judgment represents a final judgment. The circuit court found that the Mexican judgment represented a judicial determination that Wells Fargo, as the creditor, could recover the deficiency after the sale of the Mexican property. This amounted to a finding that the Mexican judgment is final in the sense that it contemplates Wells Fargo taking the final steps of sale of the property and final calculations of what the Hennessys owed. The circuit court specifically found that the Mexican judgment "allows Wells Fargo to foreclose on the secured property and to seek any resulting deficiency from the Hennessys." Thus, the sale of the property, calculation of any deficiency, and efforts to collect the deficiency from the Hennessys personally—to the extent these events involve additional judicial proceedings—are part of the execution of the judgment.[15]

---

[15] The Hennessys argue that the circuit court revealed an erroneous view of finality in its discussion, in the course of making its oral ruling, in citing *Societe*. However, the Hennessys fail to direct us to any statement made by the federal district court in *Societe*, which addressed a French judgment, that sheds light on how the circuit court here was permitted to exercise its discretion in deciding whether to defer to the effect of the Mexican judgment, "out of mutual respect and for the purpose of furthering the orderly administration of justice." *See Mills v. Vilas Cty. Bd. of Adjusts.*, 2003 WI App 66, ¶19, 261 Wis. 2d 598, 660 N.W.2d 705. Our discussion in the text addresses the substance of the Hennessys' arguments based on *Societe*.

¶41    The Hennessys contend that, by domesticating the Mexican judgment, the circuit court improperly allowed Wells Fargo to "leapfrog" steps required under Mexican law.    Among the allegedly "leapfrogged" steps was judicial review of the Wisconsin-law-based agreements "to determine if the Wisconsin Contracts permit recourse beyond foreclosure."    The premise of this argument is that the circuit court clearly erred in finding that the Mexican court took into account the Wisconsin-law-based agreements in ordering the Hennessys to surrender the Mexican property to Wells Fargo "so that the property may be auctioned under the terms of the chapter applicable to this matter."    We cannot say this was clear error.

¶42    At bottom the Hennessys' finality subargument is merely a resurfacing of their challenge to fact finding by the court regarding the meaning of Mexican law, which still lacks a showing of clear error.    The Hennessys argue that the circuit court should not have found that the Mexican judgment permits Wells Fargo to "immediately" enforce, or "in any regard" take action to execute on, Wells Fargo's right to "relief for non-payment" by the Hennessys.    Again, the Hennessys' argument is that the Mexican judgment, being the product of a strictly *in rem* proceeding, contemplates the need for a new Mexican action and new Mexican judgment before Wells Fargo could reach the point of obtaining a domesticated judgment entitling it to any deficiency that might be shown following the sale of the Mexican property.    We have already explained why any such argument fails in the absence of a demonstration of clear error.

C.    **Specified Sum Of Money**

¶43    In a similar vein to their finality argument, the Hennessys contend that comity was not an option available to the circuit court because the Mexican

judgment did not order the Hennessys to pay Wells Fargo a specific sum.  What is needed, they argue, is a statement of a "to-the-penny sum."   In support, the Hennessys cite § 481(1) of the Restatement, which provides in pertinent part that the foreign final judgment at issue must involve a grant of "recovery of a sum of money."[16]

¶44     However, as Wells Fargo points out, the Mexican judgment awarded to Wells Fargo a "clear template for calculating" a specific sum, and ordered the Hennessys to pay that definite amount:  $7.5 million, plus unpaid ordinary interest, damages, fees, and costs, as set forth in the construction loan documents, based on the default on the loan collateralized by the Mexican property, to satisfy all unpaid obligations of the Hennessys under the construction loan agreements.  The fact that collection on the domesticated judgment would require Wells Fargo to submit accurate summaries of accounts—including such values as the amount received on sale of the Mexican property and all payments already made by the Hennessys— does not render indefinite the $7.5 million obligation under the construction loan agreements.  The Mexican judgment could no doubt be *more* specific in various ways.  But the Hennessys fail to identify a basis for us to conclude that this fill-in-specific-blanks template cannot, under Mexican law, reasonably count as the equivalent of a Wisconsin money judgment for payment of an amount of money that can be readily and fairly determined.

---

[16] The Hennessys cite three U.S. federal district court opinions for the proposition that a "specific sum" of money must be stated in a foreign judgment before it may be entitled to comity as a domesticated money judgment, but they fail to explain why the circuit court here was obligated to make its discretionary decision based on this authority.

¶45   Further, Wells Fargo acknowledges the right of the Hennessys to defend themselves in the Mexican courts on such topics as costs, fees, and a deficiency judgment amount as Wells Fargo continues to pursue enforcement in that country.   Wells Fargo also explicitly acknowledges that rulings of the Mexican court would bind it in the U.S., and that Wells Fargo is not entitled to inconsistent or duplicative relief.   The Hennessys assert in a conclusory manner that the circuit court here opened the door to "double recovery" by Wells Fargo. But they fail to explain how this would lead to any duplicative relief, nor do they dispute that they continue to have the benefit of any such defenses regardless of domestication of the Mexican judgment.

### D.      Usurping, Disrespecting Mexican Judicial Process

¶46   The Hennessys argue that the circuit court's comity decision was an erroneous exercise of discretion because it usurped and disrespected the Mexican courts.   This is so, the Hennessys contend, because it "leapfrogged an entire Mexican proceeding (the deficiency action) to docket [in Wisconsin] a ruling with no collectable judgment amount."   However, as we have explained, under the findings of the circuit court regarding Mexican law, which are not clearly erroneous, comity here honors a valid, final Mexican judgment.   The Mexican judgment serves as a basis for U.S. collection while still allowing the Mexican courts to adjudicate the details of whatever enforcement Wells Fargo pursues in Mexico.   It might demonstrate disregard for the Mexican judgment on its face if the Hennessys were able to show us how they lack the ability to fairly defend themselves in the collection action by insisting on accurate costs, fees, and deficiency amounts.   However, the Hennessys do not make any such showing.   So far as they explain the situation, they appear to retain the ability to advocate for proper calculations of what they precisely owe based on enforcement in Mexico.

## CONCLUSION

¶47     For all these reasons, we affirm the rulings of the circuit court declaring the Mexican judgment valid under Mexican law and domesticating the Mexican judgment.

*By the Court*.—Order affirmed.